Filed 11/3/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LORETO A. LAGRISOLA et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>NORTH AMERICAN FINANCIAL CORPORATION,<br><br>    Defendant and Respondent. | D080758<br><br><br><br>(Super. Ct. No. 37-2021-00020798-CU-CO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

James Swiderski for Plaintiffs and Appellants.

Greeley Thompson, David M. Greeley; Mitchell Sandler and Arielle Stephenson for Defendant and Respondent.

In 2017, Loreto and Mercedes Lagrisola (the Lagrisolas) applied for and obtained a loan from North American Financial Corporation (NAFC), secured by a mortgage on their residence.  In 2021, the Lagrisolas sued NAFC, individually and on behalf of a class of similarly situated persons.  In the operative First Amended Complaint (FAC), the Lagrisolas alleged that NAFC was not licensed to engage in lending in the state of California between 2014 and 2018 and asserted violations of Business and Professions Code section 17200 and Financial Code sections 22100 and 22751.

The trial court sustained NAFC's demurrer to the FAC without leave to amend, concluding that the allegations in the FAC were insufficient to establish an actual economic injury, necessary for standing under Business and Professions Code section 17200, and that there was no private right of action under Financial Code sections 22100 and 22751. The Lagrisolas assert the trial court erred in reaching each of the foregoing conclusions. On our own de novo review, we reach the same conclusions as the trial court, and accordingly, we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Because this case arises from a demurrer sustained without leave to amend, we set forth the relevant, well-pleaded factual allegations from the FAC. (See *Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 35 ["we deem all well-pleaded factual allegations of the complaint to be true"].)

NAFC is a Nevada based business entity with offices in California. In 2017, the Lagrisolas borrowed $550,000 from NAFC, secured by real property in San Diego. This was one of 319 loans NAFC originated to California consumers between July 1, 2014 and August 27, 2018. NAFC acted as both the loan broker and the lender on the loans, but was licensed in California only as a broker. NAFC was not licensed to lend money to consumers in California, as required by Financial Code section 22100, during the relevant time period.

NAFC did not inform any of its prospective borrowers that it was not licensed as a lender in California. And, according to the FAC, "NAFC's dual role as both loan broker and lender prevented [the Lagrisolas] from learning about its unlicensed status as lender. Ordinarily, the loan broker would be tasked with ensuring that Plaintiff homeowners only borrowed from lenders

2

with the proper license in the state." The Deed of Trust securing the loan for the Lagrisolas identified NAFC as the "Loan originator" and included a Nationwide Multistate Licensing System and Registry (NMLS) number for NAFC but did not specify whether NAFC was licensed as a finance lender.[1]

The Lagrisolas were unaware that NAFC was not licensed as a finance lender and would "never have signed up to a loan with NAFC had they been informed that the company was not legally permitted to make loans to them or to any other California borrower." They "would have gone elsewhere to obtain their loans had they been informed that NAFC" did not hold a lending license. NAFC resold the loans it issued, including the Lagrisolas', into a secondary marketplace and received compensation from the resale of each loan.

In December 2020, California regulators entered into a settlement agreement with NAFC to address its unlicensed lending activity. Pursuant to the settlement agreement, included as exhibit B to the original complaint, NAFC was ordered to "refrain from violating Financial Code section 22100, subdivision (a), by engaging in the business of a finance lender without obtaining a license" and to pay an administrative penalty of $75,000. The parties acknowledged the settlement agreement was "intended to constitute a full, final, and complete resolution of the violations." The settlement was the

---

[1] The NMLS is a publicly available "web-based system that allows state-licensed non-depository companies, branches, and individuals to apply for, amend, update, or renew licenses issued by state regulatory agencies." (1 Res. Mort. Lend. State Reg. Man. West California Mortgage Lending § 4:2; see also NMLS Consumer Access portal, available at <https://www.nmlsconsumeraccess.org>[as of Nov. 3, 2023], archived at <https://perma.cc/LMM3-Q8PV>.)

"first public revelation of NAFC's unlicensed lending activity," and the impetus for the current litigation.

The Lagrisolas assert three causes of action in the FAC.[2]  In the first cause of action, they allege that NAFC violated Business and Professions Code section 17200 by engaging in unlicensed lending in violation of Financial Code sections 22100 and 22751.  They contend that NAFC earned "illegal interest" by engaging in this unlawful lending, and that the retention of such profits "constitutes a loss of money or property" to them, and other similarly situated plaintiffs.

In the second cause of action, the Lagrisolas assert violations of Business and Professions Code section 17200 based on the alleged deceptive act of failing to disclose that NAFC was not licensed to make loans in California.  They allege that NAFC's unlicensed status was a material fact that borrowers would want to be informed of prior to making a decision to enter into a loan transaction and, if they had known, they "never would have agreed to participate in NAFC's violation of the law by paying illegal interest and finance charges to NAFC, rewarding them for non-compliance with the licensing requirements of California law."  And, as in the first cause of action, they allege that NAFC earned "illegal interest which it is required to forfeit to the borrowers."

In the third cause of action, the Lagrisolas allege direct violations of Financial Code sections 22100 and 22751.  As in the first and second causes of action, they assert that the "law specifically commands that an unlicensed

---

[2]    The Lagrisolas asserted only the first cause of action in their original complaint.  The trial court sustained a demurrer to the complaint with leave to amend, and the Lagrisolas filed the FAC.  They restated the first cause of action in the FAC, "to preserve the matter for appeal," and added the second and third causes of action.

lender is to forfeit all interest and finance charges made on any unlicensed loan." They acknowledge that NAFC has since sold the loans, and therefore is no longer collecting interest, but contend that NAFC must forfeit any profit it made through the sale of the unlicensed loans to the secondary market.

NAFC filed a demurrer to the FAC. After briefing and argument, the trial court concluded that the allegations in the FAC did not adequately allege an injury in fact and therefore failed to establish standing to bring a claim under Business and Professions Code section 17200, and that there is no private right of action under Financial Code sections 22100 and 22751. Accordingly, the trial court sustained the demurrer without leave to amend.

The Lagrisolas timely appealed from the resulting judgment.

## II. DISCUSSION

The Lagrisolas challenge each of the trial court's determinations on appeal and contend that the court erred in sustaining the demurrer to the FAC.

### A. *Standards of Review*

On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, "we review the operative complaint 'de novo to determine whether the complaint alleges facts sufficient to state a cause of action under any legal theory or to determine whether the trial court erroneously sustained the demurrer as a matter of law.' " (*Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 292 (*Morris*).) "If the demurrer was sustained, as it was in this case, our function is to determine whether the complaint states sufficient facts to state a cause of action." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222

5

Cal.App.3d 1371, 1381, quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)[3]

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*Blank, supra*, 39 Cal.3d at p. 318.) "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*) We may "take notice of exhibits attached to the complaints," and "[i]f facts appearing in the exhibits contradict those alleged, the facts in the exhibits take precedence." (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447.) We may also consider prior versions of the pleadings, particularly where previous allegations are altered or omitted without adequate explanation. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 12; *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1109.)

B. *Plaintiffs Lack Standing to Assert Violations of Business and Professions Code Section 17200*

As discussed above, the FAC alleges that NAFC was unlicensed to make loans, and that the "making of the loan by NAFC without the proper license to do so is an unlawful business practice actionable by way of a suit under Business & Professions Code section 17200." It then asserts two separate causes of action under Business and Professions Code section 17200;

---

[3] The Lagrisolas do not argue that they could cure any deficiencies in the FAC by amendment and do not ask for the court to find that the trial court erred in denying leave to amend. Accordingly, we do not consider whether the trial court should have granted them leave to amend. (See *Medina v. Safe-Guard Products Internat., Inc.* (2008) 164 Cal.App.4th 105, 112, fn. 8; *Hendy v. Losse* (1991) 54 Cal.3d 723, 742 ["The burden is on the plaintiff, however, to demonstrate the manner in which the complaint might be amended"].)

one based on violations of Financial Code sections 22100 and 22751, and one based on NAFC's allegedly deceptive act of failing to disclose that it was not licensed as a lender.

Business and Professions Code section 17200 (commonly referred to as the Unfair Competition Law, or the "UCL") defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500)." Section 17204 further provides, in relevant part, that "[a]ctions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by . . . a person *who has suffered injury in fact and has lost money or property as a result of the unfair competition*." (Bus. & Prof. Code § 17204, italics added.)

The latter statute was amended in 2004 with the passage of Proposition 64. The purpose of Proposition 64 was to "materially curtail[ ] the universe of those who may enforce" the UCL in a private action by "confin[ing] standing to those actually injured by a defendant's business practices," and "to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been *injured in fact under the standing requirements of the United States Constitution*." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320–322 (*Kwikset*).) "To satisfy the narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset*, at p. 322; accord *California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1086.)

7

Here, NAFC contends, as it did in the trial court, that the FAC fails to adequately allege that the Lagrisolas suffered an injury in fact or lost money or property as a result of its licensing status. The trial court agreed. It explained that "a loan has no subjective or intangible value," and that the Lagrisolas "cannot establish standing (injury in fact) by alleging that they now possess something they would not have similarly valued or selected had they been aware of the unlicensed status of the lender. The loan [the Lagrisolas] obtained was identical to the terms and characteristics they desired."

The court in *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583 (*Peterson*) considered the "injury in fact" requirement for standing imposed by Proposition 64 in a similar context—the unlicensed sale of insurance. The plaintiffs there argued that Cellco, a communications equipment vendor doing business as Verizon Wireless, improperly charged them an insurance premium for cellphones they had purchased. (*Peterson*, at p. 1586.) As here, Cellco did not have a license to sell insurance but was allegedly retaining a portion of the insurance premiums paid by the plaintiffs as a "fee." (*Id.* at pp. 1586–1587.) Also as here, the plaintiffs alleged violations of the UCL, but the trial court ultimately sustained a demurrer without leave to amend, finding that the plaintiffs "had 'been repeatedly unable to state facts supporting the legal requirement of actual injury and pecuniary loss as required by Proposition 64.' " (*Peterson*, at pp. 1587–1588.)

The appellate court affirmed the trial court's decision and, in doing so, rejected the plaintiff's view that they were injured "because they paid the alleged unlawful commission that was illegally retained" by Cellco. (*Peterson, supra,* 164 Cal.App.4th at p. 1591.) The court explained, "plaintiffs here do not allege they paid more for the insurance due to defendant's

collecting a commission [from the sale of the insurance]. They do not allege they could have bought the same insurance for a lower price either directly from the insurer or from a licensed agent. Absent such an allegation, plaintiffs have not shown they suffered actual economic injury. Rather, they received the benefit of their bargain, having obtained the bargained for insurance at the bargained for price." (*Ibid.*) Moreover, the plaintiffs did "not allege they were dissatisfied with the insurance or were uninformed of its price." (*Peterson*, at p. 1592.) Rather, they acknowledged that Cellco had "disclosed to them 'the price and extent of the insurance coverage.' " (*Ibid.*) In addition, the court concluded that a person has not "lost money" as required for standing under the UCL simply because it is " 'no longer in their possession.' " (*Peterson*, at p. 1592.)

Likewise, in *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105 (*Medina*), the court affirmed the sustaining of the demurrer as to a UCL action based on the alleged unlicensed sale of insurance. There, the plaintiff alleged that a vehicle service contract he had purchased was an insurance contract, and that the vendor, Safe-Guard, was not licensed to sell insurance in California. (*Medina*, at. pp. 108, 113.) Like the reasoning in *Peterson*, the *Medina* court noted that the plaintiff "has not alleged that he didn't want wheel and tire coverage in the first place, or that he was given unsatisfactory service or has had a claim denied, or that he paid more for the coverage than what it was worth because of the unlicensed status of Safe-Guard. He hasn't suffered any loss *because* of Safe-Guard's unlicensed status." (*Medina,* at p. 114.) As the court explained, further, "[t]he point of the Proposition 64 amendment was to impose *additional* requirements on plaintiffs beyond merely having suffered an 'unlawful, unfair or fraudulent

9

business act or practice,' namely, having lost money or property as a result of that practice." (*Medina,* at p. 115, fn. omitted.)

Similarly here, the Lagrisolas do not allege that they did not want a loan in the first instance, that they paid any more for their loan than they otherwise would have, or that they could have obtained the loan at the same or lower price from another lender that was licensed. Nor do they allege that they suffered any particular harm because of NAFC's unlicensed status. Rather, they concede in the FAC that NAFC was licensed as a broker and, although they set forth the additional requirements that NAFC would have had to meet to be licensed as a lender as well, they do not contend that NAFC would not have been able to meet those requirements. In fact, the settlement agreement attached as an exhibit to the original complaint suggests that NAFC did become licensed as a lender in August 2018. Thus, if anything, the allegations suggest that NAFC simply neglected to obtain a California lending license prior to August 2018 and, like the plaintiff in *Medina*, the Lagrisolas have not alleged that they "suffered any loss *because* of [NAFC]'s unlicensed status." (*Medina, supra,* 164 Cal.App.4th at p. 114.)

The Lagrisolas allege that they would not have agreed to the loan, or perhaps would have obtained a loan from another vendor if they had known that NAFC was not licensed as a lender. The *Peterson* court was not persuaded by a similar allegation that " 'if defendant had not offered [and] sold . . . insurance when it was not . . . licensed to do so, plaintiffs would not have purchased the . . . insurance from defendant,' " and neither are we. (See *Peterson, supra,* 164 Cal.App.4th at p. 1587.) Again, the Lagrisolas do not assert that a comparable loan was available from a licensed lender, or that NAFC's unlicensed status harmed them in any way. Notably, the FAC does allege that NAFC resold the loans, but does not allege that the purchasers

10

were not licensed.  Thus, at the end of the day, the plaintiffs were left with a loan from a presumably *licensed* lender, at the bargained for rate.  As in *Peterson*, the plaintiffs here "received the benefit of their bargain, having obtained the bargained for [loan] at the bargained for price."  (*Id.* at p. 1591.)

The Lagrisolas contend that this case is akin to the *Kwikset* case, in which the California Supreme Court found that the plaintiffs had sufficient standing based on allegations that Kwikset mislabeled the locks they bought as "Made in America."  (See *Kwikset, supra,* 51 Cal.4th at p. 329.)  As the court in *Kwikset* explained:

> "According to the second amended complaint, (1) Kwikset labeled certain locksets with 'Made in U.S.A.' or a similar designation, (2) these representations were false, (3) plaintiffs saw and relied on the labels for their truth in purchasing Kwikset's locksets, and (4) plaintiffs would not have bought the locksets otherwise.  On their face, these allegations satisfy all parts of the section 17204 standing requirement."

(*Kwikset,* at pp. 327–328.)

Here, the Lagrisolas argue that they similarly alleged that they would not have purchased the loan if they had realized that NAFC was unlicensed.  However, unlike the plaintiffs in *Kwikset*, who allegedly "*saw and relied on*" the " 'Made in the U.S.A.' " labeling when purchasing the locksets (see (*Kwikset, supra,* 51 Cal.4th at pp. 327–328), the Lagrisolas do not point to any representation that NAFC made to them about its licensing status, nor do they allege that they relied on an actual belief or understanding that NAFC was licensed when obtaining their loan.  Put more simply, the Lagrisolas do not allege that they saw or relied on a statement that NAFC was "licensed as a lender in California."  They allege, now, that they would not have obtained the loan from NAFC if they had known NAFC was not a licensed lender, but they do *not* allege that they *did* obtain the loan based

11

upon a representation by NAFC that it *was* a licensed lender. (See *Kwikset,* at p. 326 ["a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements' "].)[4]

The *Kwikset* decision did not change Proposition 64's requirement that standing under the UCL requires both (1) an economic injury and (2) that the injury be caused by "the unfair business practice or false advertising that is the gravamen of the claim." (See *Kwikset, supra,* 51 Cal.4th at p. 322.) Rather, *Kwikset* held that where the gravamen of the claim is that the seller affirmatively represented that a product had certain defined characteristics— there, that it was "Made in the U.S.A."—and plaintiffs allege that they chose that product in reliance on that representation, the plaintiffs can establish that they did not receive the benefit of their bargain, and therefore they suffered an economic injury caused by the unfair business practice or false advertising sufficient to confer standing. (*Ibid*.) As the *Kwikset* court put it, "[s]imply stated: labels matter," and a consumer that affirmatively relies on a label in choosing one product over another suffers an economic injury when they pay money for a product with a label that turns out to be false. (*Kwikset*, at p. 328.)

The allegations set forth in the FAC at issue here do not similarly establish an economic injury caused by an unfair business practice under the *Kwikset* framework for at least two related reasons.

---

4     Further, as the trial court explained here, loans are not the same as locks: "Unlike a product or consumable good, a loan has no subjective or intangible value . . . its value is wholly dependent on its terms, such as the interest rate, principal amount and number of payments." And, as we have explained here, the Lagrisolas ultimately got the loan they bargained for.

First, the Lagrisolas do not allege that NAFC made an affirmative representation about the product. As we have explained, the analysis of economic injury in *Kwikset* turned solely on plaintiffs' allegations that the defendant falsely labeled the product, affirmatively misrepresenting its characteristics, and that they had relied on that representation when purchasing the product. But the *Kwikset* court took pains to distinguish cases in which the claims arose from the plaintiff's reliance on false statements from those in which the plaintiffs did not rely on any such misrepresentation. (*Kwikset, supra,* 51 Cal.4th at p. 327.)

As the court explained, the complaint at issue in *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373 was adequate because the plaintiff had alleged that " 'she was expecting to be charged "regular rates," ' " as stated in the contract that the defendant presented, and from that, one could reasonably infer that she had relied on that affirmative representation when entering that same contract. (*Kwikset, supra,* 51 Cal.4th at p. 327, citing *Hale*, at pp. 1385–1386.) The *Kwikset* court distinguished *Hale* from other cases like *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350 and *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, in which the courts had properly sustained demurrers where the plaintiffs did not "allege any reliance on representations about rates" and, similarly, "did not allege that misrepresentations caused him to pay money for" the product at issue. (*Kwikset, supra*, 51 Cal.4th at p. 327.) In our view, the distinction is based on the presence of an affirmative representation that was material to the consumer's decision to purchase a specific product or enter a specific contract.

Here, the Lagrisolas do not allege that NAFC made an affirmative representation about its licensing status. The complaint alleges, "Financial Code section 22162 requires all lenders to disclose their license numbers on

13

all *advertisements* for loans,"[5] and that NAFC "did not inform any of its prospective borrowers of its unlicensed status." But, it does *not* allege that NAFC made any affirmative statements about its licensure status or, perhaps more importantly, that the Lagrisolas *relied* on any statements NAFC made about its licensure status when choosing to enter into the loan transaction with NAFC. The Lagrisolas later assert that NAFC's licensure status "was a material fact of which prospective borrowers would want to be informed prior to making a decision to enter into a loan transaction," but again, they make no allegations indicating that they actually *believed* that NAFC was licensed when they entered into the loan at issue, or that NAFC told them that it was.

In their reply brief, the Lagrisolas rely on a single Federal case, *Hodson v. Mars, Inc.* (2018) 891 F.3d 857, to assert that omissions may also be actionable under the UCL, particularly where the defendant does make a partial, deceptive disclosure. The court in *Hodson* did note, generally, that an omission theory of consumer fraud may be actionable under California's consumer protection laws in some cases. (*Hodson* at p. 861.) However, the court went on to hold that plaintiffs' claims in that case were foreclosed because they had not established the defendants had a duty to disclose, as required to support a fraud theory, where the omission—that the defendant

---

[5] The FAC further alleges that Business and Professions Code section 10235.5 requires disclosure of a Department of Real Estate license "on all mortgage loans," but that section actually refers to advertisements as well. (See Bus. & Prof. Code § 12035.5, subd. (a) ["A real estate licensee or mortgage loan originator shall not place an advertisement disseminated primarily in this state for a loan unless there is disclosed within the printed text of that advertisement, or the oral text in the case of a radio or television advertisement, the Department of Real Estate number and the unique identifier assigned to that licensee by the Nationwide Multistate Licensing System and Registry under which the loan would be made or arranged."].)

14

candy company sourced cocoa beans from a region known to use child labor—concerned neither a safety defect nor a "physical product defect relating to the central function" of the product. (*Id*. at p. 865.) And, as relevant here, the court came to that conclusion despite assuming, without deciding, that the existence of slave labor in the product's supply chain was in fact material to consumers. (*Id*. at p. 864.)

Likewise, here, the Lagrisolas have not established an actionable omission. They assert that NAFC was statutorily required to disclose its lending license number, that the statutory requirements to do so suggest materiality, and that, despite this, NAFC selectively disclosed only its broker number on the loan documents. They rely on the two statutes that are referenced in the FAC but address only advertisements, and Financial Code section 22337, which is *not* referenced in the FAC, but does appear to require the disclosure of the "license number of the finance lender and broker, if any" at the time a loan is made.[6] They argue that the *Kwikset* court relied on similar statutes to conclude that the Legislature had recognized the materiality of the mislabeling, but, as they acknowledge, the statutes at issue in *Kwikset* "specifically outlaw[ed] deceptive and fraudulent 'Made in America' representations." (*Kwikset, supra,* 51 Cal.4th at p. 329.) The statutes that the Lagrisolas rely on here are not so specifically aimed at deceptive or fraudulent statements regarding a lender's licensing status. Moreover, while the plaintiffs in *Kwikset* alleged violations of the same fraudulent labeling statutes, the Lagrisolas only allege violations of Financial

---

[6] Financial Code section 22337 states, in relevant part: "Each licensed finance lender shall: (a) Deliver or cause to be delivered to the borrower, or any one thereof, at the time the loan is made, a statement showing in clear and distinct terms the name, address, and license number of the finance lender and the broker, if any."

15

Code sections 22100 and 22751, neither of which concern licensing disclosures. (See *Kwikset* at p. 317.)

Further still, even if we accept that NAFC was legally required to disclose its lender license number, and failed to do so, there are no allegations in the complaint indicating the Lagrisolas *relied* on any belief or understanding that they may have had regarding NAFC's licensure status at the time they entered the loan. In fact, there are no allegations suggesting that the Lagrisolas had *any* belief at all regarding NAFC's licensing status *at the time they obtained the loan.* For example, there are no allegations indicating that the Lagrisolas knew that NAFC was supposed to be licensed in California, specifically, as both a broker and a lender; that the Lagrisolas saw the NLMS number for NAFC that was displayed on the loan documents; or that the Lagrisolas understood the inclusion of that number to mean that NAFC was licensed in California as both a broker *and* a lender. Indeed, if they were concerned about NAFC's dual-license status, they could have easily used the license number displayed on the documents to verify the same through a readily available public database. (See fn. 1, *ante.*)

Thus, even if an omission could fall into the *Kwikset* framework, as the Lagrisolas assert, they still have not established causation, the second element required for standing under the UCL. As we have explained, the Lagrisolas do not allege that they relied on either a representation *or* an understanding created by an omission, and thus cannot allege that such a representation or omission *caused* an economic injury to them. *Kwikset* noted that "a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements' " and show that " 'the misrepresentation was an immediate cause of the injury-producing conduct.' " (*Kwikset, supra,*

16

51 Cal.4th at pp. 326–327.) Proposition 64's requirement that the plaintiff's economic injury be caused by the unfair competition " 'requires a showing of a causal connection or reliance on the alleged misrepresentation.' " (*Kwikset*, at p. 326.) The Lagrisolas nowhere allege that any injury to them was caused by a misrepresentation or omission, or that they relied on any such misrepresentation or omission. Put another way, the Lagrisolas cannot show that they suffered any economic injury because of, or resulting from, NAFC's failure to inform them that it did not have a lending license.[7]

Instead, the Lagrisolas attempt to establish causation by alleging that they would not have purchased the loan had they known NAFC was unlicensed, a fact they only discovered three years later because of the public settlement. This subjective assertion of an intangible harm falls short of establishing the elements for standing under the UCL. As the *Kwikset* court pointed out, whereas federal standing may be based on "intangible" injury that does not involve lost money or property, UCL standing is more stringent. (*Kwikset, supra,* 51 Cal.4th at p. 324.) We do not believe that the *Kwikset* court intended to expand Proposition 64 to include standing to plaintiffs like the Lagrisolas based on their intangible distaste for NAFC's failure to complete the licensing process in California, a failure for which the state took appropriate action to remedy. The test for standing cannot turn on a consumer's *post hoc* belief about the seller's status, particularly in the absence of an affirmative misrepresentation about that status at the time the consumer entered the transaction. Even where the consumer's beliefs may be

---

7    By contrast, in *Kwikset*, the conduct of misrepresentation directly caused the economic injury, because it induced the plaintiffs to purchase a product based on the false statement on its label. (*Kwikset, supra,* 51 Cal.4th at p. 327 ["plaintiffs saw and relied on the labels for their truth in purchasing Kwikset's locksets"].)

17

seen as reasonable, (e.g. that a business operating in California has the proper licensing, has sufficient insurance, is in full regulatory compliance, has laudable hiring practices, etc.), Proposition 64 did not intend to throw the doors open to UCL lawsuits arising only from a consumer's view of how the company does business. And, while we agree that *Kwikset* stands for the proposition that the subjective thoughts of a consumer may be material in some cases, the plaintiff must still establish that those subjective thoughts played some role in their decision to go through with the actual transaction. The Lagrisolas have not done so here.

Rather, here, the Lagrisolas have conflated an actionable type of economic injury, as described in *Kwikset*, with conduct by the seller that causes such injury. In *Kwikset*, the actionable conduct by the seller was the misrepresentation that the locks were "Made in America." (*Kwikset, supra,* 51 Cal.4th at p. 327.) The *Kwikset* plaintiffs relied on that misrepresentation in purchasing the locks, and such reliance caused them to purchase a product that lacked a characteristic that they found desirable. Here, NAFC's alleged actionable conduct was the lack of a license; but NAFC made no statements about its licensing status and the Lagrisolas do not allege that they considered or relied on NAFC's license status at the time they entered into the loan. Moreover, the lack of a license did not impact the loan itself, and the loan terms were and remained satisfactory to the Lagrisolas. Thus, they have not established that they suffered any economic injury because of NAFC's unlicensed status.

Finally, the Lagrisolas assert that the court in *Kwikset* rejected the "benefit of the bargain" analysis employed in *Peterson* and *Medina*. In our view, the *Kwikset* court did not reject that analysis; rather, the court stated, "Whether or not a party who actually received the benefit of his or her

18

bargain may lack standing, *in this case, under the allegations of the complaint, plaintiffs did not.*" (*Kwisket, supra,* 51 Cal.4th at p. 332, italics added.) As the *Kwikset* then explained in detail, the plaintiffs in that case had very specifically bargained for a product that was "Made in the U.S.A." but had unknowingly received one that was not. (*Ibid.*) Therefore, just like a consumer that specifically bargains for organic milk but receives non-organic milk, they did not receive the benefit of their precise bargain. (*Id.* at pp. 332–334.) The Lagrisolas also point to *Hansen v. Newegg.com Americas, Inc.* (2018) 25 Cal.App.5th 714, in which the court noted that *Peterson* and *Medina* were decided before *Kwikset*, under similar theories and by the same appellate court that was reversed in *Kwikset*. (*Hansen*, at p. 731.) But that fact alone does not support a conclusion that *Peterson* and *Medina* are no longer good law. Instead, the *Kwikset* court cited *Peterson* and *Medina* favorably, and simply distinguished them from a different type of case in which the plaintiffs expressly relied on a material representation about the product.

Here, even considering the *Kwikset* framework, for the reasons we have explained, the Lagrisolas have not established that they suffered an economic injury caused by an unfair or unlawful business practice of NAFC. Therefore, they lack standing to assert the UCL claims, and the trial court did not err in dismissing the first and second causes of action.

C. *There Is No Private Right of Action Under Finance Code Sections 22100 and 22751*

In the third cause of action in the FAC, the Lagrisolas assert violations of Finance Code sections 22100 and 22751, based on the allegation that "NAFC lacked a license to lend money to California borrowers." They assert that the "law specifically commands that an unlicensed lender is to forfeit all interest and finance charges made on any unlicensed loan."

19

Financial Code section 22100, subdivision (a) provides, "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Section 22751, subdivision (a) provides, "[i]f any amount other than or in excess of the charges permitted by this division is charged or contracted for, or received, for any reason other than a willful act of the licensee, the licensee shall forfeit all interest and charges on the loan and may collect or receive only the principal amount of the loan." And related section 22752, subdivision (a) likewise provides that the licensee shall forfeit all interest and charges on the loan "[i]f any provision of this division is violated in the making or collection of a loan."

Here, the Lagrisolas acknowledge that NAFC sold the loans and is no longer collecting interest or charges, but assert that NAFC made a profit on the sale of the loans, in part because the third party buyers were able to charge interest on them. Accordingly, the Lagrisolas pray that the trial court order NAFC "to pay to Plaintiffs' [*sic*] any amounts received from either borrowers or any third party on account of the inclusion of interest or finance charges on the amounts loaned to Plaintiffs in each of the unlicensed loans made to them by NAFC."

The trial court sustained NAFC's demurrer as to this cause of action as well, ruling that the statutory scheme does not contemplate a private right of action to pursue violations of the Financial Code. As noted above, we review the trial court's ruling on this issue de novo. (See *Morris, supra,* 78 Cal.App.5th at p. 292; *Blank, supra,* 39 Cal.3d at p. 318.) Like the trial court, we conclude that neither Financial Code section 22100 nor Financial Code section 22751 provide a private right of action.

A violation of a state statute does not automatically give rise to a right of recovery by a private individual. Courts will allow a private right of action

20

only where a statute allows one. (*Mayron v. Google LLC* (2020) 54 Cal.App.5th 566, 571.) The statute must contain " ' " 'clear, understandable, unmistakable terms,' " which strongly and directly' indicate a private right of action is allowed." (*Ibid*., citing *Lu v. Hawaiian Gardens Casino, Inc*. (2010) 50 Cal.4th 592, 596–597.) If the statue "does not contain an unmistakable directive," the court may consider the legislative history of the statute to determine whether the Legislature intended to create a private right of action. (*Mayron, supra,* at p. 571.)

As relevant here, Financial Code section 22713 specifically provides that the commissioner may bring an action or request that the Attorney General bring an action in the name of the people of the State of California. (Fin. Code § 22713, subd. (a).) The violator may then be liable for civil penalties, as NAFC was here. (Fin. Code § 22713, subd. (b).) Moreover, "[i]f the commissioner determines that it is in the public interest," *the commissioner* may include "a claim for restitution, disgorgement, or damages." (Fin. Code § 22713, subds. (b) & (c).) Here, it is undisputed that the commissioner resolved such an action against NAFC through a settlement in December 2020. Despite the final resolution of that matter, the Lagrisolas now seek to pursue damages for NAFC's alleged Financial Code violations in addition to those recovered by the commissioner. But, when regulatory statutes, like the Financial Code, " ' "provide a comprehensive scheme for enforcement by an administrative agency, the courts ordinarily conclude that the Legislature intended the administrative remedy to be exclusive unless the statutory language or legislative history clearly indicates an intent to create a private right of action." ' " (See *Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 337.)

21

The Lagrisolas point to Financial Code section 22752, subdivision (a), which provides that "the licensee shall forfeit all interest and charges on the loan" if the licensee violates a provision of the Financial Code. However, this language does not clearly indicate a private right of action, particularly when read in context with Financial Code section 22713. It merely provides that the licensee may not collect interest on the loan. This is far different from the type of statutory language held to support a private right of action. (See *Lu, supra,* 50 Cal.4th at p. 597 [listing examples of clear directives, including language "expressly stat[ing] that a person has or is liable for a cause of action for a particular violation"].)

The Lagrisolas rely on *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353. There, the court found that the language of Business and Professions Code section 6061 conferred a private right of action on students who alleged that Chapman had not provided the disclosures required by the statute. As relevant here, the statute provides, "[i]f any school does not comply with these [disclosure] requirements, *it shall make a full refund of all fees paid by students*." (Bus. & Prof. Code § 6061, italics added.) The *Goehring* court concluded that the statutory requirement of a refund to students meant that the students had the right to pursue an action for the refund due to them. (*Goehring, supra,* 121 Cal.App.4th at p. 377 [distinguishing cases in which the relevant statute "did not expressly entitle individuals to a refund or any other type of payment for violation of the statute"].)

Here, Financial Code section 22752, subdivision (a) provides for a *forfeiture* of fees and interest, not a refund. Unlike *Goehring*, in which the statute expressly identified both the party in violation, against whom the claim could be asserted (there, the University) and the party to whom

22

payment should be made (there, the private-party student claimants, through a refund to them), the Financial Code does not identify a private party to whom the forfeited amounts would be repaid. Rather, it simply states that the lender can only collect on the principal and must forfeit any interest. And, as we have already noted, section 22713 specifically provides for enforcement through action by the commissioner.

Finally, the courts can also look to a statute's legislative history to ascertain whether the Legislature intended to convey a private right of action. But, here, the Lagrisolas have not identified any legislative history, or other legal authority, to support a conclusion that the Legislature intended that violations of the Financial Code could be pursued by a private right of action. (See *Singman v. IMDB.com, Inc.* (2021) 72 Cal.App.5th 1150, 1151 [appellant bears the burden of establishing legal error through citations to the record and relevant legal authority].)

Accordingly, we agree with the trial court's reasoning that the provisions of the Financial Code "do not provide 'clear, understandable, unmistakable terms' for a private cause of action," but instead provide for enforcement of violations "via an action by the [c]ommissioner" which "is what occurred in this case."

## III. DISPOSITION

The judgment of the trial court is affirmed. Respondents are entitled to their costs on appeal.

KELETY, J.

I CONCUR:

O'ROURKE, Acting P. J.

Dato, J., Concurring and Dissenting.

California law expressly requires a mortgage lender to be licensed before making home loans in this state. Between 2014 and 2018, defendant North American Financial Corporation (North American) made more than 300 home loans without any lender's license. Predictably, it never disclosed to prospective borrowers that it lacked the required license. By making these unlicensed loans, almost by definition North American engaged in an unlawful and fraudulent business practice within the meaning of California's Unfair Competition Law (UCL), Business and Professions Code section 17200 et seq.[1]

The majority opinion endorses the trial court's logic in sustaining North American's demurrer without leave to amend based on a lack of standing. The trial court believed that because "a loan has no subjective or intangible value," plaintiffs got what they paid for—a loan of money on agreed-upon terms—and accordingly suffered no "economic injury" despite the unsurprising allegation in their complaint that they would not have entered into the loan transactions had they known North American was unlicensed. The trial court's reasoning is strikingly similar to an analysis rejected by the Supreme Court in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320–322 (*Kwikset*). Narrowly construing the reach of that decision, the majority finds *Kwikset* distinguishable on its facts. In my view, however, *Kwikset* stands for the general principle that where plaintiffs fairly allege they would not have entered into a consumer transaction had they known of an illegality, misrepresentation, or material omission by the defendant, they have adequately pleaded an economic injury for the purpose of establishing

---

[1]  Subsequent statutory references are to the Business and Professions Code unless otherwise indicated.

1

standing to sue under the UCL. Because North American's lack of a license would be material to a reasonable homeowner's decision where to obtain a home loan, I believe *Kwikset* controls and I respectfully dissent.[2]

A

The Supreme Court's *Kwikset* decision provides the framework for analysis. In that case, the defendant sold locksets labeled "Made in U.S.A." even though several component parts were made elsewhere, a violation of California law, specifically section 17533.7. (*Kwikset, supra,* 51 Cal.4th at p. 317.) Like the trial court in this case, the Court of Appeal in *Kwikset* concluded that plaintiffs lacked standing to bring a UCL claim because they failed to allege any loss of money or property within the meaning of section 17204. In that court's view, the plaintiffs received just what they intended to purchase—locksets that they did not allege were overpriced or defective. (*Kwikset,* at pp. 319–320.) As a result, they lost nothing.

The Supreme Court disagreed. Reviewing the standing requirements established by the Proposition 64 initiative in 2004, Justice Werdegar's opinion acknowledged the concerns of initiative proponents that prior law had permitted UCL suits by individuals "who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant." (*Kwikset, supra,* 51 Cal.4th. at p. 321, internal quotations omitted.) She explained that just as the "intent of this

---

[2]  I concur in the majority opinion to the extent it concludes there is no private right of action under Financial Code sections 22100 and 22751. Of course, the absence of a direct private right of action is no bar to claiming a UCL violation based on an unlawful business practice. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 561–567; *Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210–211.)

change was to confine standing to those actually injured by a defendant's business practices," it was equally clear that standing was preserved " 'for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices.' " (*Ibid.*)

Noting that the plaintiffs' case was " 'based on a fraud theory involving false advertising and misrepresentations to consumers' " (*Kwikset, supra,* 51 Cal.4th at p. 326), the Supreme Court concluded the complaint properly alleged standing by asserting that (1) the defendant made a representation about the product, (2) the representation was false, (3) plaintiffs relied on the truth of the representation, and (4) they would not have bought the product had they known the true facts. (*Id.* at pp. 327–328.) Summarizing its holding, the court stated, "A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation.[ ] That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. *It is also sufficient to allege economic injury*." (*Kwikset,* at p. 330, italics added, fn. omitted.)

Recognizing that plaintiffs here entered into loan transactions with North American and make a nearly identical allegation—they would not have done so had they known it was an unlicensed lender—the majority opinion effectively dismisses the *Kwikset* analysis by pointing out that this case does not involve an affirmative misrepresentation.[3] (Maj. opn., *ante,* at p. 13 ["the

---

[3]     It is significant that the majority opinion relies primarily on two Court of Appeal decisions, *Peterson v. Cellco* (2008) 164 Cal.App.4th 1583 and *Medina v. Safe-Guard Products, Internat., Inc*. (2008) 164 Cal.App.4th 105, both of which were decided *before Kwikset.* (Maj opn., *ante*, at pp. 8–10.) *Medina,* in turn, relied almost exclusively on a third case, *Hall v. Time Inc.*

analysis of economic injury in *Kwikset* turned solely on plaintiffs' allegations that the defendant falsely labeled the product, affirmatively misrepresenting its characteristics"].)  But this is a distinction without a difference.  It has been well-settled California law for decades that a UCL claim asserting a fraudulent business practice is not limited to affirmative misrepresentations.  It can also be based on a defendant's failure to disclose material information if it can be fairly alleged there was an obligation to disclose the omitted fact.  (E.g., *Chern v. Bank of America* (1976) 15 Cal.3d 866, 876; *Paduano v. American Honda Motor Co., Inc.* (2009) 169 Cal.App.4th 1453, 1469; *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 255, 258–259; *Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 271; cf. Civ. Code, § 1710, subd. (3) [defining deceit as "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"].)  Here, as the majority opinion recognizes, there are statutes that require a lender to disclose its license number.  (See Fin. Code, § 22337; see also *id.*, § 22162; Bus. & Prof. Code, §10235.5.)  That the Supreme Court's *Kwikset* opinion

---

(2008) 158 Cal.App.4th 847.  All three cases are from the same division of the Court of Appeal that was reversed by the Supreme Court in *Kwikset*.  As a more recent case explains, these cases "were decided before *Kwikset*, which held that the [typical] 'benefit of the bargain' theory has no relevance when the misrepresentation underlying the UCL claim is material in nature." (*Hansen v. Newegg.com Americas, Inc.* (2018) 25 Cal.App.5th 714, 731.) As *Hansen* explained, these earlier decisions "appear[ ] to have been based on the same 'benefit of the bargain' reasoning" that was rejected by the Supreme Court in *Kwikset*.  (*Hansen,* at p. 731, fn. 6.)  While it is true that *Kwikset* cited both *Peterson* and *Medina*, they were cited for propositions unrelated to the reasoning on which the majority opinion relies.

4

makes statements about the affirmative misrepresentation involved in the case hardly means its reasoning only applies in that limited context.[4]

B

The majority opinion goes on to suggest that even if *Kwikset* is not limited to affirmative misrepresentations, such that North American should have disclosed its failure to obtain a lender's license, plaintiffs have failed to allege they relied on any belief or understanding that North American was properly licensed. (Maj. opn., *ante*, at p. 16.) The problem with this suggestion is twofold. First, reliance is inherent in the plaintiffs' allegation that the failure to disclose the lack of a license was a *material* omission,[5] because it was information a reasonable borrower would consider important in deciding whether to do business with North American. (*Downey v. Public Storage, Inc.* (2020) 44 Cal.App.5th 1103, 1116.) Alleging a material misrepresentation or omission gives rise to a presumption or inference of

---

[4]     Moreover, if North American included a license number in its loan materials, but referenced a *broker's license* rather than a lender's license (maj. opn., *ante*, at p. 15), plaintiffs could allege an *affirmative* representation that was deceptive and misleading because it failed to disclose additional information.

[5]     Paragraph 30 of plaintiffs' amended complaint specifically alleges: "[North American] was not legally allowed to be engaged in the business of lending money to California borrowers at the time it made the loans to the plaintiffs and to the proposed class of plaintiffs. *This was a material fact* of which prospective borrowers would want to be informed prior to making a decision to enter into a loan transaction secured by their home. Plaintiffs in this case would not have considered borrowing money on a home loan from a business that was operating illegally and without the proper licensure. Plaintiff would have gone to any legal lender had they known that [North American] was operating illegally and without oversight from the regulatory authorities responsible for supervising the activities of licensed lenders."

reliance. (*Ibid.,* quoting *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 327.) And materiality is a question of fact not generally subject to resolution on demurrer. (See, e.g., *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977, citing Rest. 2d Torts, § 538, com. e, p. 82.) Second, even if reliance were not implicit in the allegation of a material omission, the plaintiffs here *did* allege they relied on North American's failure to disclose its unlicensed lending status by pleading that they would not have entered into the loan transaction had they known North American was unlicensed.[6] (Cf. *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1019 [the public reasonably assumes that individuals holding themselves out as "accountants" were licensed as such in the absence of a disclosure to the contrary].)

C

Finally, plaintiffs here allege more than simply a deceptive business practice within the meaning of section 17200. They also allege that apart from what it represented or failed to disclose, North American committed an

---

[6]    Reliance on a misrepresentation or material omission is typically pleaded as plaintiffs have done here—through an allegation that they would not have acted in the way they did (i.e., would not have hired the defendant, would not have purchased the defendant's product, would not have entered into a contract with the defendant, etc.)—in the absence of the misrepresentation or material omission. (See, e.g., *Torres v. Adventist Health System/West* (2022) 77 Cal.App.5th 500, 513 [reliance properly alleged if the complaint asserts "plaintiff would not have acted as he or she did without the misrepresentation or the omission of fact"].) In fact, the reliance element of a claim for fraudulent concealment—a claim of fraud when a party is obligated to disclose a fact but intentionally conceals or suppresses it—has been stated in precisely the same way: "*the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact.*" (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606, italics added.)

*unlawful* business practice when it made a home loan without the proper license. (See *Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 604, fn. 10 [approving allegation of unlawful business practice for "[t]ransacting insurance without a license"].) As the Supreme Court has repeatedly emphasized, an "unlawful" business practice under section 17200 includes "anything that can properly be called a business practice and that at the same time is forbidden by law." (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266; *Kwikset, supra,* 50 Cal.4th at p. 320.) Here, making unlicensed loans is an unlawful business practice under this broad definition. And again, I read *Kwikset* as saying that UCL plaintiffs properly plead standing— economic injury and causation—if they allege they would not have entered into the challenged transaction but for the actionable business practice about which they complain.

I would reverse the judgment with directions to overrule the demurrer as to the first and second causes of action alleging violations of the UCL.


DATO, J.

7